This action was brought by the plaintiff 669 Atlantic Street Associates' (hereinafter "669") to foreclose a purchase money note and mortgage made and delivered by the defendant, Atlantic-Rockland Stamford Associates (hereinafter "ARSA"). Based upon the evidence presented, the court finds the following facts.
669 is a Connecticut general partnership consisting of two partners, John Schorsch and Paul Gugenheim. Schorsch and Gugenheim also owned and operated the Royal Metals Corporation (hereinafter "Royal Metals"), a company in the business of reclaiming precious metals (mainly silver) primarily by burning waste photographic film. ARSA is also a Connecticut general partnership which consists of Peter L. Malkin and another general partnership, ARSA Associates, which consists of Peter Malkin and his son, Anthony E. Malkin.[1]
During the early 1980's, Schorsch and Gugenheim assembled a group of four properties (hereinafter "the property") in the south end of the city of Stamford by either outright purchases or by acquiring options. Schorsch and Gugenheim operated Royal Metals on one of the properties and leased the remaining space to tenants, including Ovabloc (a medical research company owned by Schorsch) and a fiberglass boat building concern known at different times as Northeast Fiberglass and New England Fiberglass. During 1985 Schorsch and Gugenheim decided to sell the property. The property was close to the Metro Center office complex which was then being developed by Warwick and Malkin.[2] Given the property's proximity to Metro Center, Schorsch and Gugenheim approached Warwick and Malkin as prospective purchasers. Warwick and Malkin were interested in buying the properties in order to develop an office complex adjacent to the Metro Center near the Stamford railroad station, which came to be known as "Metro II." CT Page 3773
Negotiations for the sale of the properties began in approximately the late winter to early spring of 1986. Warwick and Malkin needed time to acquire additional properties necessary for the development of Metro II. While Schorsch and Gugenheim wanted to continue operating Royal Metals for a few more years, they also wanted to realize some immediate cash and so the parties planned a sale-leaseback arrangement. Thus, from approximately April to September, 1986, the parties negotiated and drafted four core documents contemporaneously: a contract for the property's sale to ARSA; a lease back to 669; a purchase money note; a mortgage to secure the unpaid portion of the purchase price.
The primary subject of these negotiations was the presence of hazardous wastes and materials on the property and the possibility of resulting contamination. Warwick and Malkin both had serious concerns about the environmental condition of the property from the beginning, and as a result, insisted upon a preliminary environmental investigation and testing of the property pursuant to provisions included in the core documents. ARSA required 669 Atlantic to assume certain obligations and make certain representations regarding the presence of hazardous materials, compliance with environmental laws and regulations, and the environmental condition of the property.[3]
The documents were completed by late September, 1986 and on September 30, 1986, the contract of sale was executed. The contract provided for a purchase price of $5,637,500, with $1,437,500 to be paid prior to closing and the balance to be paid by a nonrecourse promissory note to be secured by a nonrecourse mortgage on the property. The remaining documents, the note, mortgage and lease were executed at the closing, on November 17, 1986. The note was in the principal amount of $4,200,000 and by its terms was due on December 31, 1989. The note provided for an annual interest rate of 7.72%, requiring quarterly interest payments of $81,060. The note further provided for a default interest rate of 15%.[4] The lease was a so-called "triple net lease," which required 669 to be responsible not only for rent but for taxes, insurance, and all other carrying costs of the property. 669's rent was due quarterly and was calculated to equal the amount of ARSA's interest payments. The lease expired on December 31, 1989, the date the note was due.
During the term of the lease, an ongoing dispute arose CT Page 3774 regarding 669's performance of its obligations regarding the environmental condition of the property and the presence and extent of environmental contamination. ARSA and 669 separately retained an environmental consultant each of whom had performed a preliminary environmental site assessment of the property by October 31, 1989. Subsequently, ARSA and 669 began negotiating an extension of the maturity date of the note and mortgage while their attorneys coordinated a joint effort by their respective environmental consultants to assess the condition of the property.
The parties also endeavored to negotiate an extension of the lease which would have called for entering into a direct lease with Royal Metals. However, the parties never reached agreement regarding the extension. Their environmental consultants made their final recommendations in June, 1990 and April, 1991, respectively.
ARSA's consultant, HRP Associates, Inc. (hereinafter "HRP"), identified two primary areas of concern: (a) the loading dock area near Royal Metals' space wherein the soil contained impermissible levels of tricholoroethylene and tetrachloroethylene; and (b) New England Fiberglass' drum storage area where HRP detected impermissible levels of acetone in the soil. HRP also recommended asbestos removal, cleaning of the interior of Royal Metals' building and the excavation of an underground storage tank and some surrounding soil. 669's consultant, TRC Environmental Consultants, Inc. ("TRC"), believed that only the drum storage area warranted remediation. In recommending the most comprehensive and conservative remediation, HRP estimated that in the worst case scenario, the maximum cost of remediation would be $275,000. TRC estimated a cost of approximately $91,000 to remove soil from the drum storage and loading dock areas and to remove the underground tank and surrounding soil. Royal Metals also became involved in an ongoing dispute with the Connecticut Department of Environmental Protection (hereinafter "DEP") during the lease term and into 1991. DEP inspectors visited the property in August, 1986, apparently without ARSA's knowledge, and again in March, 1990. As a result, it ordered Royal Metals to test its incoming and outgoing waste streams for hazardous materials.[5] Without such tests, DEP could not determine how Royal Metals should be classified under the pertinent environmental laws or what laws and regulations were in fact applicable. CT Page 3775
The failure of Royal Metals to perform these tests as ordered lead DEP to issue an administrative abatement order in June of 1990. Royal Metals made some efforts to comply with the order including testing its waste streams. However, Royal Metals never complied to DEP's satisfaction and the matter was referred to the Attorney General who brought a civil action against Royal Metals in February, 1991. By May of 1991 Royal Metals had left Connecticut, and being informed of that fact, the action was withdrawn and the abatement order closed in September of that year.
In March of 1992, Gugenheim returned to the property to oversee the removal of the suspected acetone-contaminated soil from the drum storage area. Schorsch and Gugenheim gave no advance notice of the clean-up to either ARSA or DEP. DEP made a visual inspection of the property in July, 1992 and concluded that "[n]o additional remedial action is necessary at the site," but no further soil or ground water testing was performed. At trial, 669 offered expert testimony that although it had done less remediation than anyone had recommended it had done all that DEP would require. ARSA presented expert testimony to the contrary, claiming that the property remained contaminated.
Essentially, ARSA claims that because 669 never properly assessed the extent of environmental contamination on the property, never fully remedied the contamination and failed to deliver the property "clean," ARSA is excused from performance under the note and is entitled to damages. In fact, ARSA never paid the note. ARSA advanced its theory of the case by way of six special defenses and a three count counterclaim.[6]
 I The Motions to Dismiss
A. ARSA's Motion
On the first day of trial, Union Trust Company appeared and moved to intervene in this action claiming an interest in the note and mortgage by virtue of a collateral assignment from 669. The court denied the motion as untimely. Subsequently, ARSA moved to dismiss the complaint based on the plaintiff's claimed failure to make out a prima facie case. Practice Book § 302. First, ARSA argued that since 669 had assigned the note and mortgage to Union Trust Company it was no longer the holder of the note. CT Page 3776 Second, ARSA argued that 669's obligations under the lease were conditions precedent to ARSA's duty to pay the balance of the note which conditions 669 Atlantic had never satisfied; therefore, ARSA reasoned it had no duty to perform under the note.
1. Is 669 the holder of the note and mortgage?
Based on the title theory of mortgages, ARSA argues that 669'S assignment of the note was a conveyance of the land 669 held as mortgagee and divested 669 of all title and interest over the property. However, when the holder of a mortgage collaterally assigns it to secure a debt which is less than the amount of the mortgage, the holder retains a sufficient interest in the mortgage to maintain an action to foreclose it. Gordon v.Donovan, 111 Conn. 106, 110 (1930); Hopson v. Aetna Axle SpringCo., 50 Conn. 597 (1883).
669's assignment to Union Trust Company was a collateral assignment. Further, 669 assigned a mortgage in the amount of 4.2 million as collateral security for a 1.3 million debt. Therefore, 669 has a sufficient interest in the note and mortgage to foreclose it.
Even conceding ARSA's conveyance theory, 669 assigned the note and mortgage after commencing this action and in the instrument of assignment explicitly reserved its right to continue the action. If 669 has in fact conveyed the property it held as mortgagee, it is entitled, as grantor, to reserve an interest in that property. 669 did so expressly. Therefore, the assignment to Union Trust Company does not prevent 669 from foreclosing the mortgage.
 2. Are 669's obligations under the lease conditions precedent to ARSA's duty to pay the balance of the note?
ARSA argues that in addition to evidence of the elements of its prima facie case for foreclosure, 669 must present evidence that it has performed all of its obligations under the parties' agreement and has satisfied any conditions precedent to ARSA's duty to perform. See, e.g., Smith v. Lewis, 26 Conn. 109, 118
(1857); Northrop v. Town of Clinton, 14 Conn. Sup. 28, 33 (1946). ARSA argues that as of the close of 669's case, 669 had not proven that it had satisfied certain obligations under the lease which ARSA claims were conditions precedent to payment of the CT Page 3777 note. In deciding a motion to dismiss for failure to make out a prima facie case, it is "the duty of the trial court to take as true the evidence offered by the plaintiff and to interpret it in the light most favorable to him, with every reasonable inference being drawn in his favor." P. B. § 302. Berchtold v. Maggi,191 Conn. 266, 271 (1983); Discover Leasing, Inc. v. Murphy,33 Conn. App. 303, 306 (1993).
"Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties . . . ." Reid andReige, P.C. v. Brainerd Cashman Ins. Agency, Inc., 26 Conn. App. 580,583-384 (1992). At the time ARSA moved to dismiss, only John Schorsch had testified regarding ARSA's claim that 669's obligations under the lease were conditions precedent to ARSA's performance under the note. Schorsch testified that such was never the parties' intent. In fact, Schorsch testified that the lease, note and mortgage were separate and distinct and that the parties never intended them to have any interdependent effect. Taking Schorsch's testimony to be true and viewing it in a light most favorable to 669, the testimony does not establish that 669 and ARSA intended the obligations of the lease to be conditions to ARSA's performance under the note. Nor do any of the exhibits admitted into evidence as of the close of 669's case evince such an intent. Therefore, 669 was not required to prove that it had fulfilled all of its obligations under the lease in order to make out a prima facie case for foreclosure. The motion to dismiss is denied.
B. 669's Motion
At the conclusion of ARSA's case 669 moved to dismiss counts three (CUTPA) and four (tortious interference with contract/business expectancies) of ARSA's counterclaim. 669 Atlantic claimed that ARSA had failed to make out a prima facie case on either count. P.B. § 382.
1. Tortious Interference with Contract/Business Expectancies
ARSA has withdrawn this count of its counterclaim.
 2. Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. ("CUTPA") (Second Special Defense; Sixth Counterclaim)
 a. Do the alleged non-environmental breaches of theCT Page 3778 lease violate CUTPA?
ARSA claims that 669 violated CUTPA in the following ways, among others: (i) by failing to surrender the property when the lease expired; (ii) by subletting the properties after the lease expired; and, (iii) by failing to pay rent after December 31, 1989. The evidence establishes that all of the foregoing occurred with ARSA's knowledge and apparent consent while ARSA was negotiating direct leases with Royal Metals and other subtenants and, at the same time, negotiating with 669 to extend the note and mortgage [see, e.g. Plaintiff's Exhibits M, N, S, T, U]. Thus, this conduct cannot be considered unfair or deceptive.McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 568
(1984); Caldor, Inc. v. Heslin, 215 Conn. 590, 597 (1990). The remaining acts ARSA claims violate CUTPA all implicate 669's obligations regarding the environmental condition of the property.
 b. Is ARSA entitled to relief based on the remaining alleged CUTPA violations?
In a private action under CUTPA, in order to obtain relief the claimant must establish the he/she has "suffer[ed] an ascertainable loss of money or property . . . as a result of the use or employment of [an unfair or deceptive trade practice] . . . ." General Statutes § 42-110g(a). Proof of an "ascertainable loss" does not require proof of actual damages. "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property."Hinchcliffe v. American Motors Corp., 184 Conn. 607, 614 (1981). Therefore, "[t]o satisfy the ascertainable loss requirement, a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained." Id. at 614-615.
Assuming arguendo that 669 violated CUTPA and further assuming that ARSA purchased the property partially as a result of 669's unfair or deceptive practices, the property was not different from that for which ARSA bargained. ARSA claims the property was different from what it bargained for because 669 did not adequately investigate and remedy environmental contamination. ARSA contends that it bargained for a "clean" property, i.e. a property that 669 had investigated and remediated such that DEP or the United States Environmental CT Page 3779 Protection Agency would not require further remediation or subject the property to environmental liens. It is clear however, that ARSA bargained for a property which although contaminated was nevertheless cleanable without risk or cost to ARSA.
Just as ARSA bargained to impose responsibility for any environmental problems upon 669, so too ARSA bargained to protect itself in the event that 669 failed to do so. Malkin testified that he wanted to be "absolutely sure that there would be no possibility that [he] . . . could be subject to criticism for a condition" caused by 669. Malkin testified that he therefore obtained local counsel "specially knowledgeable" in such matters and instructed ARSA's attorneys to include language in the transaction documents that would "clearly protect" ARSA and "avoid any possibility that [Malkin] could become involved in any hazardous environmental issue."
ARSA's lawyers ensured precisely that. ARSA fully insulated itself from environmental liability by including hold-harmless clauses in both the contract and the lease which required 669 to indemnify and defend ARSA (1) for any claim arising out of 669's use or occupancy of the property; (2) any act of neglect; (3) any failure to perform an obligation under the lease; and, (4)
specifically, "regarding all work to be performed by [669] to clean up any hazardous waste . . . ." ARSA further protected itself from environmental liability by expressly subjecting the sale of the property to the Transfer Act, General Statutes 22a-134et seq.
ARSA protected itself specifically against 669's failure to investigate adequately and/or remedy any environmental contamination by securing the right independently to assess the condition of the property and the further right to perform at 669's expense any obligation under the lease which 669 Atlantic failed to perform. Similarly, ARSA ensured that it could, without any risk or expense to itself, cure any of 669's defaults pursuant to the terms of paragraph 28 of the lease which contains 669's most significant environmental obligations. Clearly, the note and lease give ARSA a right to offset the actual costs of curing such defaults from the balance due under the note. Thus, when negotiating for the property, ARSA contemplated the possibility that 669 might default on its environmental obligations and that ARSA might be required to cure those defaults. ARSA contractually ensured that in such event it could do so without facing liability or expense and without diminution CT Page 3780 in the property value because of environmental issues.
ARSA claims that it lost approximately 8 million dollars that it spent preparing for the Metro II development in reliance on 669's promises regarding the environmental condition of the property. If in fact 669 did fail adequately to assess and remedy environmental contamination on the property, the court cannot find that Metro II ceased to be a viable project as a result of such failure. There is no causal connection between the two. As 669 Atlantic suggests, it is impossible to believe that had the Stamford real estate market continued booming ARSA would have canceled Metro II and sought to rescind this transaction because 669 failed to clean up the property.
Even if 669 has violated CUTPA, ARSA has suffered no ascertainable loss as a result. Taking all of ARSA's evidence as true and drawing every reasonable inference in ARSA's favor, the primary result of 669's alleged unfair and deceptive conduct is that the property is contaminated and needs remediation. This situation did not prevent ARSA from developing Metro II. Further, ARSA bargained precisely for this situation and thereby had the ability to remedy it to its satisfaction without risk and totally at 669's expense. Therefore, ARSA has presented no evidence that it suffered any ascertainable loss as a result of the acts it complains of in count three of the counterclaim.
Since ascertainable loss is an element of a private CUTPA claim, ARSA has failed to make out a prima facie case. For the same reason, ARSA cannot prevail on CUTPA as a special defense. Based upon the foregoing discussion, the court hereby grants 669's motion to dismiss count three of the counterclaim and finds the issues for the plaintiff on ARSA's sixth special defense.
 II. Are the contract, lease, note and mortgage interdependent, such that the terms of each constitute one instrument?
 A. The documents are interdependent.
Generally, where the terms of a single transaction are contained in several writings, those writings should be read together as one instrument. Mongillo v. Comm'r of Transportation,214 Conn. 225 (1990); Expressway Associates II v. Friendly IceCream Corporation of Connecticut, 22 Conn. App. 124 (1990); CT Page 3781Cooper v. Malavese, 24 Conn. Sup. 168 (1962, cert. denied,150 Conn. 717 (1962).
The terms of the note, mortgage, contract and lease, although contained in separate writings, are all terms of a single contract. The evidence is undisputed that all four documents were negotiated and drafted contemporaneously. The note, mortgage and lease were executed on the same day. While the contract for sale was executed earlier, the sale closed on November 17 when the other documents were executed. The note is incorporated into the mortgage and the lease is required under the contract. While no other document is actually incorporated into another, the note, contract and lease are attached to the mortgage and there are numerous references in each of the documents to the others.
Most importantly, all four documents were necessary to effectuate the intent and to promote the interests and expectations of the parties. The evidence established that in entering into the transaction 669 wanted to realize some immediate cash but at the same time wanted Royal Metals to continue operating. Similarly, ARSA wanted to acquire the properties but needed time to acquire others before it could develop them. Thus, the parties intended a sale and leaseback from the beginning of their negotiations. ARSA's leasing the property back to 669 is in fact required under the contract. Both Malkin and Warwick testified that neither would have signed one document without the others, and neither Schorsch nor Gugenheim offered any plausible testimony that this was not their intent as well. Each of the documents was necessary to express and carry out fully the parties' intent.
The court finds that the documents are interdependent and must be read as a single instrument.[7]
 III May ARSA's default for nonpayment of the note and mortgage be deemed not to exist pursuant to paragraph 4J of the mortgage and a corresponding provision in the note? (First Special Defense)
The note and mortgage provide:
 Notwithstanding any contrary provisions of the note or of the mortgage which it secures relating to events of default, no default CT Page 3782 herein or therein shall be deemed to exist . . . so long as the lesee [669 Atlantic] under that certain lease dated even date herewith covering the mortgaged premises . . . shall be in default in the payment of rent, additional rent, or in the performance of any other obligations, which failure of performance of such other obligation is also the basis of a default hereunder.
ARSA contends that by operation of paragraph 4J of the mortgage it is not in default for non payment of the note and mortgage because 669 is in default under the lease in that it failed to surrender the premises when the lease expired, continued subletting the premises after that date and did not pay rent as a holdover tenant.
A. Rent versus other obligations under the lease
Paragraph 4J imposes different triggering requirements where the lessee's default is nonpayment of rent, as opposed to a default on some "other obligation." Nonpayment of rent by itself, triggers paragraph 4J. Defaults on "other obligations", however, are subject to an additional requirement. In order for 669'S default on some "other obligation" to trigger paragraph 4J, 669's default under the lease must also be "the basis of a default" under the note or mortgage.
The parties dispute the meaning of this qualifying phrase. ARSA contends that it means that ARSA will not be deemed to be in default so long as 669 is in default of any obligation under the lease "which also constitutes a default under the note ormortgage." This interpretation, however, is contrary to the terms of the note, mortgage and lease. It is impossible for 669'S default under the lease to "also constitute" a default under the note or mortgage since none of 669'S obligations pursuant to the lease are also 669'S obligations under the note or under the mortgage. 669 contends, and the court agrees, that the correct reading of this phrase is that in order for ARSA's default in payment of the note to be deemed not to exist, ARSA's nonpayment must be predicated directly upon a concomitant failure of 669 to perform specific and relevant obligations that relate directly to ARSA's payment of the note. In other words, 669's default under the lease must, to some extent, cause ARSA to default under the note and/or mortgage, i.e., prevent ARSA from doing something it is required to do or compel it do something it is prohibited from doing. Only in such a case would 669'S default trigger the foregoing provision. CT Page 3783
B. 669's alleged defaults on "other obligations."
Even assuming that 669 defaulted on its obligations under the lease (other than its obligation to pay rent), these defaults do not trigger the provision in question. ARSA claims that, in addition to not paying rent as a holdover tenant after the lease expired on December 31, 1989, 669 1) failed to surrender the premises when the lease expired in violation of paragraph 5; 2) continued subletting the premises after the lease expired in violation of paragraph 9; 3) failed to perform the remediation work recommended in environmental site assessments before the lease expired in violation of paragraph 28; 4) failed to keep the property free of nuisances in violation of paragraph 5; and, 5) and failed to comply with all orders, regulations, rules and requirements of all governmental authorities in violation of paragraph 6. None of these defaults prevented ARSA from paying the note or affected ARSA's ability to pay. Malkin admitted this on cross examination. Thus, ARSA has not proven that any of the foregoing defaults by 669 were "also the basis of" ARSA's nonpayment of the mortgage. Consequently, none of these defaults would have triggered paragraph 4J so as to enable ARSA to deem its default not to exist.
C. 669's alleged nonpayment of rent.
According to paragraph 4J, 669's nonpayment of rent after December 31, 1989 would have deemed ARSA's default under the note and mortgage not to exist; this is so, however, only as long as 669 had a duty, under the lease, to pay rent.
Following expiration of the lease on December 31, 1989, 669 became a tenant at sufferance and, as such, no longer had any contractual obligation to pay rent. "A tenancy at sufferance arises when a person who came into possession of land rightfully, continues in possession wrongfully after his right thereto has terminated." Welk v. Bidwell, 136 Conn. 603, 608-609 (1950). Where, after expiration of a lease, the tenant continues in possession while negotiating with the landlord disputed terms of future occupancy, but "there [has] actually been no meeting of the minds either because of ambiguity or uncertainty in negotiations or because the negotiations had not been completed, then, of course, there [is] no contract." Id., at 607. In such case, the landlord has not consented to the tenant's continued CT Page 3784 possession and, consequently, a tenancy at sufferance arises. Id., at 608-609; Berlingo v. Sterling Ocean House, Inc., 5 Conn. App. 302
(1986). A tenant at sufferance has no contractual obligation to pay rent but, rather, is required by law to pay the reasonable value of his/her use and occupancy of the property.Welk v. Bidwell, supra, 136 Conn. 607; Lonergan v. ConnecticutFood Store, Inc., 168 Conn. 122 (1975); Housing Authority v.Hird, 13 Conn. App. 150 (1988).
ARSA and 669 never reached agreement regarding the latter's continued occupancy of the property. In 1988, ARSA and Royal Metals began negotiating a direct lease. In January, 1989, ARSA and Royal Metals had tentatively agreed to some terms, but not others, including rent. Later in 1989, ARSA and 669 began negotiating a contemporaneous extension of the note and mortgage but did not reach agreement as of December 1989. In January, 1990 ARSA and 669 reached a tentative agreement on certain points regarding extension of the note and mortgage and ARSA and Royal Metals reached a new tentative agreement for a direct lease. Negotiations continued as to other points, however, through the spring and into the summer of 1990 at which time there were still significant disagreements particularly concerning environmental issues. The parties never completed their negotiations nor did they ever reach a final agreement. Therefore, 669 was a tenant at sufferance until it vacated the property. Welk v. Bidwell, supra.
As such, 669 had no contractual duty to pay rent as stipulated in the lease. Welk v. Bidwell, supra, at 607; Lonerganv. Connecticut Food Store, Inc., supra, at 131 (1975), as ARSA and 669 no longer had a contract for the payment of rent. While ARSA may have had a claim for the reasonable value of 669's use and occupancy beyond December 31, 1989[8], after that date, ARSA could no longer claim the protection of paragraph 4J.
The court finds for the plaintiff as to the first special defense.
 IV. Are 669's obligations under the lease and contract conditions precedent to ARSA's duty to pay under the note? (Second Special Defense)
ARSA contends that 669's obligations under the contract and lease were conditions precedent to ARSA's duty to pay the note and mortgage. ARSA claims that because 669 did not fulfill CT Page 3785 certain of those obligations, ARSA has no duty to pay. Therefore, ARSA maintains, ARSA is not in default under the note or mortgage and 669 Atlantic cannot maintain this action for foreclosure.
"A condition precedent is a fact or event that must exist or take place before there is a right to performance". The nonoccurrence of such a condition pends that obligor's duty to perform on the ground that its [performance] is not due as long as the condition has not occurred." Zivic v. Zivic, 26 Conn. App. 5,9 (1991). "Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties . . . ." Patronv. Konover, 35 Conn. App. 504, 514 (1994); "The court must determine the parties' intent based on their expression in the contract, the situation of the parties and the circumstances surrounding the transaction". Leonard Concrete Pipe v. C.W.Blakeslee Sons, Inc., 178 Conn. 594 (1979); Reid Reige, P.C.v. Brainerd Cashman Ins. Agency, Inc., 26 Conn. App. 580 (1992). "The question is not what intent existed in the minds of the parties but what intention is expressed in the language used."Leonard Concrete Pipe v. C.W. Blakeslee Sons, Inc., supra.
A. Language and Content of the Documents
The language and content of the note, mortgage, contract and lease do not support ARSA's claim that its obligation to pay the note was subject to conditions.
First, ARSA expressly and unambiguously subjected its obligations to conditions in two places: under paragraph 4J of the mortgage discussed in Part III, supra, which is also contained in the note; and under paragraph 8 of the contract. Under paragraph 4J, ARSA is not required to pay the note and is protected from default in the event of certain defaults by 669 under the lease. This provision expressly subjects ARSA's duty to pay to the condition that 669 Atlantic not default, as defined in paragraph 4J, under the lease. This provision indicates that the parties identified the events which would excuse or suspend ARSA's duty to pay and limited them to those expressly set forth. Similarly, in paragraph 8 of the contract, 669's duty to cause an environmental site assessment to be performed on the property prior to closing is expressly made "a condition of closing," at ARSA's option (emphasis added). This provision indicates that where the parties intended certain of ARSA's obligations to be conditional, they said so. This, in turn, indicates the parties CT Page 3786 did not intend any of ARSA's obligations to be conditional absent such an express provision. See Bank of Boston Connecticut v.Schlesinger, 220 Conn. 152 (1991).
Secondly, several factors demonstrate that ARSA wanted and intended this transaction to go forward even if 669 did not fulfill its obligations under the contract and lease. This transaction was a small part of a development which Malkin estimated would cost more than 200 million dollars and that ARSA's own Denis Lyndon projected could eventually provide each partner with an annual net return of $364,000. It is not reasonable to believe that ARSA would want to afford itself the option of calling off this project in the event that 669 breached its obligations regarding the environmental condition of the property. Rather, ARSA wanted to ensure that this transaction would go forward notwithstanding any such breach. Therefore, ARSA bargained for the right to cure 669's defaults and to charge the costs to 669 as rent; to offset the costs of curing any such breach itself from the money owed to 669, and for the right to indemnification from 669 for any claim arising out of 669's occupancy of the property and/or breach of the contract or of the lease. The inclusion of the foregoing provisions constitutes unmistakable evidence that ARSA never intended to insist that 669 perform all of its obligations; rather, these provisions show that ARSA intended to cure 669's defaults, then pay the balance of the note reduced by ARSA's costs of doing so.
 B. Situation of the Parties and the Circumstances Surrounding the Transaction
ARSA never manifested to 669 its intent that its obligation to pay the note was subject to conditions. In urging 669 to comply with the provisions of paragraph 28 of the lease, ARSA repeatedly reminded 669 of its right of offset and repeatedly asserted that it intended to exercise this right, if necessary. ARSA never, however, expressed to 669 the belief that 669's compliance with paragraph 28 was a condition of ARSA's paying the note. ARSA never claimed that it was legally excused from paying the note nor did it claim that it was not going to pay it.
Even among themselves, the principals of ARSA and officers of Warwick Malkin, Inc. and W M Properties never expressed the belief that ARSA was legally excused from paying the note if 669 did not fulfill its obligations under the contract and lease. During the lease and mortgage extension negotiations, ARSA's CT Page 3787 principals and associates repeatedly discussed the need to insure that ARSA had the right to offset environmental remediation costs which they may have to incur as a result of 669's failure to clean the property. No one ever claimed that such failure would completely discharge ARSA from its obligation to pay the note.
In fact, ARSA's internal discussions suggest that ARSA believed the opposite to be the case. In a memo to Peter Malkin, Anthony Malkin refers to the unpaid balance of the note as a "practical strength" and to the Transfer Act as ARSA's "strongest legal weapon". Had ARSA believed that its payment of the note was subject to conditions precedent, the unpaid balance would be more than a practical strength; it would in fact be a "legal weapon" ARSA could use to ensure that 669 complied with all of its obligations. Furthermore, ARSA's attorney who represented ARSA during the negotiations and drafting of the documents urged ARSA to exercise its right of offset before it "disappeared" when the note became due. If, due to 669's failure to clean the property ARSA was legally excused from paying the note at all, then it didn't need a right of offset.
In summary, ARSA presented no evidence, other than Malkin's claim, that the parties intended 669's obligations under the contract and lease to be conditions precedent to ARSA's obligation to pay the note. In his mind, Malkin may have so intended, but that intent is not expressed anywhere in the documents themselves nor evidenced by the situation of the parties or the circumstances surrounding this transaction. All of these factors, in fact, inexorably lead to a contrary conclusion.
The court finds for the plaintiff as to the second special defense.
 V. Is ARSA excused from performance of its obligations under the note and mortgage because of 669's alleged breaches of the contract and lease? (Third Special Defense)
ARSA's third special defense alleges that 669 breached the lease and the contract and that these breaches excuse ARSA from performance under the note. The court has previously found that the note, mortgage, contract and lease are interdependent, comprise the terms of a single transaction and should be read as a single contract. Therefore, 669's alleged breaches of the CT Page 3788 contract and lease are breaches of the same contract under which ARSA is obligated to pay the $4,200,000. 669's alleged breaches should not be viewed, as 669 contends, as breaches of collateral agreements unrelated to ARSA's obligation under the note.
A. 669's Alleged Breaches
 1. Lease
ARSA alleges that 669 breached the lease in the following ways: 1) by failing to surrender the premises when the lease expired in violation of paragraph 5; 2) by continuing to sublet the premises after the lease expired in violation of paragraph 9; 3) by failing to perform the remediation work recommended in environmental site assessments before the lease expired in violation of paragraph 28; 4) by failing to keep the property free of nuisances in violation of paragraph 5; 5) by failing to comply with all orders, regulations rules and requirements of all governmental authorities, in violation of paragraph 6.
2. Contract
ARSA alleges that 669 Atlantic breached the contract as follows: In paragraph 7C, 669 Atlantic represented that at the time of the closing, to the best of its knowledge, no violations of governmental rules, regulations or limitation existed. ARSA argues that at the time of the closing, Royal Metals was in violation of DEP order to test its incoming and outgoing waste streams. In paragraph 8, 669 represented that "any hazardous waste on the Premises is being managed in accordance with all applicable hazardous waste regulations." ARSA alleges numerous violations of hazardous waste regulations. The primary allegation is the failure of Royal Metals to test its waste streams which caused DEP to issue an administrative abatement order in June, 1990 and the Attorney General to institute proceedings against Royal Metals in February, 1991. Also, pursuant to paragraph 8, 669 agreed to furnish ARSA with a Connecticut DEP Form I, II, III, in accordance with the Transfer Act. 669 does not dispute that it never did so.[9]
 B. Only a Material Breach Excuses Performance
Other than 669's alleged failure to surrender the premises and its continuing conduct in subletting the property, all of the breaches ARSA alleges have the same potential consequence, viz: CT Page 3789 an adverse impact on the environmental condition of the property. Even assuming that 669 Atlantic committed these breaches, they are not sufficiently material to excuse ARSA from performing.
An uncured, material failure of performance by one party to a contract discharges the other party from any further duty to render performances yet to be exchanged. Bernstein v. Nemeyer,213 Conn. 665, 672-673 (1990), citing Vesce v. Lee, 185 Conn. 328,334 (1981) and Silliman Co. v. S. Ippolito Sons, Inc.,1 Conn. App. 72, 75 (1983), cert. denied, 192 Conn. 801 (1984); see also Restatement (Second), Contracts 237 (1981). Only a material
breach, however, discharges the aggrieved party from further performance. To determine materiality, the court should look to the criteria set forth in the Restatement (Second), Contracts 241 (1981) Bernstein v. Nemeyer, supra. Those criteria are:
 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived
 (c) the extent to which the party failing to perform or offer to perform will suffer forfeiture
 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances
 (e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.
 C. 669's Alleged Breaches Were not Material
The court finds that the criteria set forth in (a), (b) and (d) above are dispositive of this issue. As previously discussed, ARSA was not and could not have been deprived of the benefit it reasonably expected under the contract or the pertinent provisions of the lease. That benefit came in two alternative forms: it was either a property which 669 had investigated and remediated in accordance with the contract and lease, or; alternatively, a property that ARSA could own without risk of liability and could investigate and remediate without cost to CT Page 3790 itself. As noted above, by virtue of the offset and indemnification provisions in the documents, ARSA was protected from environmental liability and could remedy any contamination at 669's sole expense. Thereby avoiding any resulting diminution in the property's value. Thus, none of these alleged breaches, assuming they occurred, could have deprived ARSA of the benefit for which it bargained. Nor can the failure of Metro II and Malkin's resulting losses reasonably be attributed to any of 669's alleged breaches. If they occurred, the environmental and regulatory breaches alleged deprived ARSA of nothing.
Similarly, ARSA presented no evidence that 669's holding over in possession of the property and subletting it beyond December 31, 1989 in any way deprived ARSA of an expected benefit. At one point, ARSA specifically instructed subtenants to pay rent to 669 and although, according to Malkin's testimony nothing prevented it, ARSA never commenced a summary process action to evict 669 to recover possession of the property. Consequently, there is no issue of compensation to ARSA for any lost benefit. The alleged breaches are also, therefore, not material according to the Restatement (Second) criteria, (b) above.
Finally, although there is no reasonable likelihood that 669 would have cured any of the alleged breaches (assuming they occurred), ARSA could have accomplished the same result as if 669 had cured them itself by exercising its right to cure them itself at 669's expense. Similarly, ARSA could have commenced a summary process action to compel 669 to surrender possession of the property and cease subletting it. Thus, cure — in the sense of avoidance of the consequences of the alleged breaches — was assured had ARSA exercised its rights to do so.
In addition to the foregoing criteria, 669's alleged breaches are also not material when viewed in light of the amount of the note as compared to the estimated cost of cleaning the property. 669's alleged environmental breaches, if they occurred, would have cost no more than $275,000. As a matter of common sense, a breach resulting in damages amounting to less than ten percent of the $4.2 million balance owed cannot be considered material.
In conclusion, since none of ARSA's alleged breaches assuming they occurred, were material, ARSA is not excused from performance. The court finds for the plaintiff as to the third special defense. CT Page 3791
D. ARSA's Claim for Rescission
On August 9, 1994, ARSA filed a motion to amend its counterclaim to request the remedy of rescission. The court reserved decision on this motion and asked the parties to discuss it in their trial briefs.
A party is entitled to rescission only where there has been a material breach of the contract. "Rescission is not warranted merely for a failure exactly to perform . . . . Before a default of one party will give the other the right of rescission, the failure to perform . . . must be in regard to matters which go to the essence or root of the [agreement] or which would render the performance of the remainder a thing different in substance from that which was contracted for, defeating the object of the parties in making the agreement." (Citations omitted.) Collins v.Sears, Roebuck Co., 164 Conn. 369, 382 (1973); see also,Bernstein v. Nemeyer, supra, 213 Conn. 672; Silliman Co. v. S.Ippolito Sons, Inc., supra, 1 Conn. App. 75.
As discussed above, none of 669's alleged breaches of the contract or lease are material breaches. Therefore, if the court permitted ARSA to amend its complaint, ARSA would not be entitled to the remedy of rescission anyway. The motion to amend is denied.
 VI. Is ARSA prevented from performing under the note because it is unable to compute the amount of environmental investigation and remediation costs it is entitled to offset? (Fourth Special Defense).
ARSA claims that it could not accurately determine what it would cost to remedy any environmental contamination on the property; that it could not, therefore, determine the amount it was entitled to offset and, as a result, was prevented from paying the note.
While our courts have recognized the doctrine of prevention of performance, they have done so only where one party to a contract prevents the other from performing, see, e.g., WilliamRaveis Real Estate, Inc. v. Stawski, 31 Conn. App. 608 (1993), or where performance becomes impracticable due to the nonoccurrence of an event which was a basic assumption of the contract, see, CT Page 3792 e.g., O'Hara v. State, 218 Conn. 628 (1991). Neither situation exists here. In any event, nothing prevented ARSA from offsetting and escrowing an amount it deemed sufficient to cover its maximum financial exposure which according to its own consultant was $275,000. In fact at one point, ARSA and 669 had tentatively agreed to offsetting the amount of the highest estimate of their consultants. Also at one time, ARSA was apparently comfortable that $250,000 would be sufficient.
ARSA's claim that it was prevented from paying the note is without merit. The court finds for the plaintiff as to the fourth special defense.
 VII. Is 669 barred from foreclosing the mortgage by the equitable doctrines of unjust enrichment or clean hands? (Fifth Special Defense).
A. Unjust Enrichment
In its fifth special defense, ARSA contends that 669 has been unjustly enriched by ARSA's $1.5 million down payment. ARSA contends that it would be inequitable for the court to allow 669 to retain the downpayment in light of 669's alleged breaches and misrepresentations under the lease and contract. ARSA claims, therefore, that it is entitled to restitution.
"To prove unjust enrichment, the purchaser must show that the loss sustained by the seller is less than the moneys received from the purchaser." Montanaro Bros. Builders, Inc. v. Snow,4 Conn. App. 46, 53 (1985), citing Vines v. Orchard Hills, Inc.,181 Conn. 501, 507 (1980). "Basically, the purchaser must show that the seller sustained a net gain." Id.
ARSA paid 669 a downpayment of approximately $1.5 million. ARSA claims 669 was thereby unjustly enriched. In entering into this transaction with ARSA, however, 669 declined competing offers of approximately $5 million for the property, which at the time of trial was worth somewhere between $1,850,000 to $2,050,000. Thus, even if 669 were successful in this action and were to recover the property, including ARSA's downpayment, 669 has sustained a net loss of approximately $1.5 million[10] as a result of this transaction. CT Page 3793
Furthermore, ARSA could have avoided the situation it now claims makes it unjust and inequitable to allow 669 to retain the downpayment. The consequence of all of 669's alleged breaches and misrepresentations and the basis for all of ARSA defenses and counterclaims is that the property was environmentally contaminated. ARSA, however, was protected from all liability or loss under several provisions of the note, contract and lease. ARSA was protected from liability for any contamination on the property by the indemnification provisions. ARSA was protected from any diminution in the property's value due to contamination by its right to remediate the property itself if 669 failed to do so. And ARSA was protected from the expense of doing so by its right of offset. ARSA elected not to avail itself of or rely upon any of these protections. Assuming all of ARSA's allegations to be true, the ultimate injury ARSA complains of was due as much to ARSA's failure to protect itself as to any failure of performance by 669. Determining whether a person has been unjustly enriched is within the trial court's discretion and, upon balancing the equities in the present action, there is no injustice or inequity in allowing 669 to retain the downpayment. Montanaro Bros.Builders, Inc. v. Snow, supra, 4 Conn. App. 53.
B. Unclean Hands
In its fifth special defense, ARSA also contends that 669 is not entitled to the equitable remedy of foreclosure because as a result of its alleged breaches, misrepresentations and neglect of its environmental obligations, 669 does not come into court with "clean hands." See, e.g. Cohen v. Cohen, 182 Conn. 193 (1980);Polverari v. Peatt, 29 Conn. App. 191 (1992).
"[I]t is a well-established rule of equity jurisprudence that the party to a suit complaining that his opponent is in court with unclean hands because of the latter's conduct . . . must show that he himself has been injured by such conduct to justify the application of the principle . . . ." (Internal quotation marks omitted.) Cohen v. Cohen, supra, 182 Conn. 206; Halloran v.Spillane's Servicenter, Inc., 41 Conn. Sup. 484 (1990). As previously discussed, any loss or injury ARSA may have sustained is as much the result of its own failure to avoid injury as any of 669's alleged conduct. ARSA therefore cannot prevail under the clean hands doctrine because it has not been injured by the conduct it claims renders 669's hands unclean. For the foregoing reasons, the court finds for the plaintiff as to the fifth special defense.[11]
CT Page 3794
 VII. Has ARSA proven its claim of misrepresentation? (First Counterclaim)
In its first counterclaim, ARSA seeks damages (including counsel fees as punitive damages) on the grounds that it purchased the property and undertook the development of Metro II in reliance on 669's representations and warranties regarding the environmental condition of the property. ARSA claims 669 knew or should have known these representations and warranties were false when made. "It is essential in an action based upon a false or fraudulent representation that the person claiming relief must establish not only that a false or fraudulent representation was made but also that he believed the statement to be true and in fact relied upon it." (Citation omitted.) City Trust Co. v.Jennings, 158 Conn. 173 (1969); Maturo v. Gerard, 196 Conn. 584
(1985).
Assuming that the representations in question were false as ARSA alleges, ARSA still has not proven that it relied upon them. ARSA clearly knew of the potential for hazardous waste contamination on the property. The inclusion of the extensive environmental provisions in the contract and lease evidence this. Malkin testified that he had concerns based solely on looking at the property and that Warwick told him that Royal Metals used hazardous materials. ARSA also had the property assessed by HRP prior to entering into this transaction and secured the right independently to perform future environmental site assessments which ARSA in fact did[12] In fact, Malkin apparently ordered a high quality site assessment from HRP for the specific purpose of affording a comparison to the assessment which 669 was required to submit during the last three months of the lease. It is clear that ARSA knew as much if not, at times, more than 669 about the potential for contamination and the actual condition of the property throughout these parties' relationship. ARSA did not rely on 669's representations regarding hazardous waste management, governmental orders and violations, or the condition of the property; ARSA performed its own ongoing investigation.
Nor did ARSA rely on 669 to clean up the property. As discussed previously, for every provision which made 669 responsible for the property's environmental condition, ARSA included a provision which protected it in the event 669 CT Page 3795 defaulted on those responsibilities viz: the right of offset; the right to indemnification; and the right to cure defaults under the lease and charge back the costs as additional rent.
Finally, the court has previously found that ARSA neither undertook nor ceased development of Metro II in reliance on anything 669 said or did. Malkin's testimony indicated that if ARSA relied on anything in undertaking Metro II, ARSA relied on Morgan Stanley's publicized plans to leave New York City and move to Stamford. According to Malkin, it was Morgan Stanley's anticipated relocation that kept Metro II viable when the Stamford real estate market softened considerably in the late 1980's and up until 1992. And, according to Malkin, it was Morgan Stanley's announcement in 1992 that it would remain in New York that made this property "like any other property" in Stamford. The court believes that this event more than any other is what is responsible for ARSA's present disenchantment with the property.
Having failed to prove reliance, ARSA cannot prevail on its claim of misrepresentation. The court finds the issues for the plaintiff as to ARSA's first counterclaim.[13]
 VIII. Is ARSA entitled to damages for 669's alleged breaches of the contract and lease? (Second Counterclaim).
For the same reasons 669's alleged breaches are not material, ARSA cannot recover damages. That is, by virtue of ARSA's right of offset, right to indemnification and right to cure defaults under the lease and charge the cost to 669 as additional rent, ARSA was insulated from any loss or damages pertaining to the property's environmental condition. Likewise, ARSA did not establish that it was damaged as a result of 669's continuing in possession of the property or continuing to sublet it. In fact, ARSA allowed 669 to remain a tenant at sufferance and directed subtenants to pay 669 Atlantic rent rather than ARSA. Had this situation been causing ARSA harm, its remedy was to commence a summary process action. The fact that ARSA never brought such an action further indicates that it suffered no damages as a consequence of 669's continued possession and subletting of the property. Thus, ARSA has failed to prove that it sustained any actual damages as a result of 669 alleged breaches.
In addition to damages, however, ARSA claims it is entitled CT Page 3796 to restitution of its downpayment, closing costs and carrying costs. "When a court grants [the remedy of restitution] for breach . . . . the effort is not to enforce the promise by protecting the injured party's expectation or reliance interest, but to prevent unjust enrichment of the party in breach . . . ." (Citations omitted.) Bernstein v. Nemeyer, supra, 213 Conn. 665,673.
In the present action, there is no evidence that 669 has been unjustly enriched, certainly not by ARSA's payment of closing and carrying costs. ARSA has not proven that it is entitled to restitution. 669 is entitled to retain the downpayment. Assuming that 669 breached the contract and lease as ARSA alleges, ARSA has failed to prove that it has sustained damages or that it is entitled to restitution. The court finds for the plaintiff on the second counterclaim. This conclusion obviates the need for analysis of 669's claims regarding the "as is" clause in the contract.
 IX. Are the reports of Accurate Environmental Services admissible?
At trial, 669 offered two reports prepared by Accurate Environmental Services, Inc. ("AES"), an environmental consulting firm which 669 used in addition to TRC [Plaintiff's Exhibits FF and GG for identification]. 669 claimed the reports would show that it tested its incoming and outgoing waste streams for hazardous wastes in accordance with the DEP's order. ARSA objected to the reports as hearsay. 669 offered them under General Statutes § 1-19a which it argued established an exception to the hearsay rule for all documents contained in the files of a public agency. The court reserved decision on this question and asked the parties to address it in their trial briefs.
In light of all of the foregoing conclusions, it is unnecessary for the court to decide this question. The court finds all of the issues for 669 Atlantic. The reports will not affect 669 Atlantic's case. Nor would the reports have any bearing on the foregoing analysis and conclusions as to ARSA.
X.
CT Page 3797
A judgment of foreclosure may enter in favor of the plaintiff. The parties are ordered to appear before the court at a short calendar session for the purpose of determining the form of judgment and other relief, if appropriate. The plaintiff is ordered to update its appraisal for that purpose.
MOTTOLESE, J.